[Cite as *In re H.R.P.T.*, 2021-Ohio-2285.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | Case No. 20CA3915 |
| | : | |
| H.R.P.T. | : | <u>DECISION AND JUDGMENT</u> |
| | : | <u>ENTRY</u> |

_____

<u>APPEARANCES</u>:

Matthew F. Loesch, Portsmouth, Ohio, for Appellant-Mother, Jennifer Tackett aka Bennett.

Randall L. Lambert, Ironton, Ohio, for Appellee, Daisy Bennett.

Christopher Tackett, Father.[1]

_____

Smith, P. J.

{¶1} Jennifer Tackett, the mother of minor child, H.R.P.T., and "Appellant" herein, appeals the judgment entry of the Scioto County Common Pleas Court, Juvenile Division, entered April 8, 2020. The trial court found that Appellant is an unfit and unsuitable parent and that it is in the best interest of H.R.P.T. that legal custody be granted to the child's grandmother, Daisy Bennett, "Appellee." On appeal, Appellant asserts that the trial court's determination finding her unsuitable is against the manifest weight and sufficiency of the evidence. However, having fully reviewed the record, we find the trial court's decision that Appellant

---

[1] Christopher Tackett has not participated in this appeal.

contractually relinquished custody of H.R.P.T. is supported by competent, credible evidence and is not against the manifest weight of the evidence. Therefore, we find Appellant's arguments are without merit and the sole assignment of error is overruled. The judgment of the trial court is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

{¶2} H.R.P.T. was born on September 26, 2012, and at the time of the custody hearing was seven years old. Appellant and Christopher Tackett, "Tackett," are H.R.P.T.'s biological parents. Appellee is H.R.P.T.'s maternal grandmother. Appellee is a pediatric nurse with a Master's degree. She has been employed providing respite care for one patient for over 20 years.

{¶3} Appellant is 39 years old. She has never obtained a high school diploma or GED. She is not employed. She does not receive Social Security Disability. In addition to H.R.P.T., Appellant and Tackett have an adult daughter, Madison Bentley, age 20 and K.T., who is two years older than H.R.P.T. Tackett also has two sons. Tackett is not employed.

{¶4} Appellee filed a pro se Petition for Custody in the Scioto County Court of Common Pleas, Juvenile Division, on August 27, 2019. Appellee alleged that it was in the child's best interest that Appellee have custody and described H.R.P.T.'s parents as follows:

> Mother is unable to care for [H.R.P.T.]. Mother has severe back problems, lupus, also mental illness. Father has liver

failure [sic] in a lot of pain.  Mother has attacked a 16 yr. old niece [sic] choking her and yelling "I'm going to kill you." Police called.  This was witnessed by 5 people including myself.

{¶5} Appellee further requested an emergency order, based on the above allegations, stating, "I am concerned [H.R.P.T.] is in danger when her mother is out of control."  Appellant and Tackett were served copies of the petition for custody and ordered to personally appear for a hearing on temporary orders on September 5, 2019.

{¶6} On September 5, 2019, an attorney on behalf of Appellee filed a notice of appearance in the matter.  Subsequent to the hearing on temporary orders, the trial court found that service was perfected on all parties and the court had jurisdiction to proceed.  However, based on the testimony adduced at the hearing, the trial court did not make temporary orders.  The petition for custody was scheduled for a full hearing on November 5, 2019.

{¶7} At the full hearing, Appellee testified that H.R.P.T. was born in September 2012.  At that time, Appellee lived in a residence on Birch Hollow in the Sciotoville, Ohio area with Appellant and Tackett, Shianne, (Appellee's 17-year-old granddaughter), K.T., H.R.P.T., and Tackett's two sons.  H.R.P.T. was a premature baby and was in the hospital's neonatal intensive care unit (NICU) for three weeks before she came home.

{¶8} Appellee testified Shianne, H.R.P.T., and she moved into a camper next to the Birch Hollow residence in January 2013. She testified she moved into the camper because "there was a lot of argumentation, cussing people out, um, [H.R.P.T.] was not allowed to be around smokers and they smoked in the house. It was just not a good environment for [H.R.P.T.] or Shianne at that time." They lived in the camper four to five months. During that time, Appellee took care of H.R.P.T., getting up with her in the night for feedings. The parents did not provide care for H.R.P.T. While living in the camper, Appellee provided financial support for everyone living in the residence and in the camper.

{¶9} Appellee, Shianne, and H.R.P.T. next moved to a residence on Harding Avenue in Sciotoville. They lived there until H.R.P.T. was approximately five years old. During that time, the child's parents and K.T. remained at the Birch Hollow residence. Appellant and Tackett did not provide financial support of any type for H.R.P.T. Appellee was the sole provider. During this time, Appellee continued to financially support Appellant and Tackett. Appellee paid for groceries, utility bills, and car repair. Eventually, Appellant, Tackett and K.T. came to live with Appellee at the Harding Avenue location.

{¶10} The group which included Appellee, Appellant, Tackett, H.R.P.T. and K.T. next lived in Minford, Ohio in a residence owned by Tackett's family. Appellee continued to pay the utilities and other expenses at the Minford residence.

H.R.P.T.'s parents still did not provide for her financially. H.R.P.T. attended school in Scioto County. Appellee testified Appellant would not get out of bed to register H.R.P.T. for school and did not drive her to school due to "physical and emotional and mental problems."

{¶11} Appellee testified that she moved to Oak Hill, Ohio (Jackson County) in August 2018. She lived in a modular home with her son, his girlfriend, the girlfriend's three children, Shianne, and H.R.P.T. Despite living in a different county, Appellee drove H.R.P.T. to school daily. Appellee was the exclusive provider of care and financial support for H.R.P.T.

{¶12} Appellee testified H.R.P.T. attended first grade at an elementary school in Jackson County until Appellant removed her from school on or about the day Appellee's petition for custody was filed. Appellee also continued to pay utilities at the Minford residence until the petition was filed. Currently, Appellee pays only Appellant's phone bill and one other bill because they are in Appellee's name.

{¶13} Appellee testified that two weeks prior to her filing of the petition Appellant pulled into the driveway at the Minford residence. Shianne got out of the car to get in another one. Appellant ran down the driveway and threw Shianne to the ground, choked her, and screamed "I'm going to kill you." Appellee and Tackett managed to free Shianne from Appellant. There were several witnesses

and the police were called.  Appellee did not file a report because she wanted

Appellant to get mental health care.  Appellee testified that since that day

Appellant has threatened Appellee and that is why she took H.R.P.T. out of school.

{¶14} Appellee also testified to other instances of Appellant behaving in a

violent manner.  A couple of years prior, Appellant slapped Appellee.  Another

time, in the McDonald's line, Appellant got mad at another driver and threatened

to beat her up.  Appellee stopped her but Appellant was mad and drove erratically,

almost running over Appellee and scaring K.T.  During the years Appellant was

addicted to drugs, Appellant once tried to choke Appellee.  According to Appellee,

Appellant fights with Tackett and cusses at the children.

{¶15} Appellee testified Appellant has physical conditions including lupus,

back problems, and a clotting disorder.  Appellant was diagnosed with bipolar

issues when she was 10 or 11.  She was sent to military school for a year.  She saw

a psychiatrist.  Recently Appellant has been diagnosed with borderline personality

disorder.  Appellant does not take medication for either mental condition but takes

Methadone and medication for her back.  Appellant has used Methadone for eight

years.  Appellant has applied for Social Security Disability for physical and mental

issues.

{¶16} Appellee testified she is concerned for the children's safety because Appellant does not supervise them. Appellant stays in bed and takes pain medication. She "drifts off" while driving.

{¶17} Appellee testified K.T. failed third grade. She missed a lot of school and is now home-schooled. K.T. isolates herself and likes to play games. She loses sleep because she plays games and stays up all night. By contrast, H.R.P.T. is a more active child. Appellee has a routine with H.R.P.T. H.R.P.T. does well in school and started to read in kindergarten.

{¶18} At the time of the hearing, Appellee had not seen H.R.P.T. for 60 days. She did not want to traumatize her more due to the legal situation. Appellee sent birthday balloons to H.R.P.T. at school. She has not been allowed to visit. She does not know if H.R.P.T. is getting to school on time.

{¶19} Appellant cross-examined Appellee. Appellant alluded to a sexual incident between Shianne and K.T. On redirect, Appellee testified she had no direct knowledge of anything other than what Appellant had told her. Children's Services was not contacted. K.T. was not examined and no police report was filed.

{¶20} Appellant also testified. On direct she testified that H.R.P.T. was happy with them and always had been. She was not in a bad or dangerous

environment. Appellant currently resides with Tackett and her three daughters in Minford in a home owned by her in-laws.[2]

{¶21} Appellant acknowledged she was addicted for six to seven years and also dated a drug dealer during that time. She also acknowledged a felony conviction for misuse of a food stamp card, although she testified someone else left it at her home. She completed the terms of her community control in 2013. Appellant's last employment was in 2015 or 2016. She drove Appellee to work and Appellee gave her money to do so. Appellant also acknowledged she was denied Social Security benefits for lack of medical evidence.

{¶22} Appellant uses Methadone for her addiction. She rides to a Methadone clinic in Chillicothe with a friend. She also has counseling there. The trial court asked Appellant why her drug tests did not show Methadone. Tackett interjected that his did not either. Both denied masking the drug. Appellant testified she takes a very low dose and also takes Gabapentin for back pain and Cyclobenzaprine, a muscle relaxer. The court noted these other drugs also did not show up on her drug tests.

{¶23} Appellant admitted she did not file a police report, contact Children's Services, or take K.T. for a medical exam despite the vague allegation of sexual

---

[2] The record indicates at times other adults have resided with Appellant and Tackett.

abuse. Appellant testified she did take her to Mahajan Therapeutics to see a counselor as a result of the abuse. She does not know if they filed any reports.

{¶24} Appellant's oldest daughter, Madison Bentley, testified she has lived with her mother most of her life. Madison attended college at Kent State in 2018 but stayed for only one semester. Since then she has worked at a daycare center.

{¶25} Madison testified H.R.P.T. has done well in the last 60 days and is "well-taken care of." She testified the child is worried Appellee would take her from Appellant. Madison admitted that she has lived with Appellee most of her life and that Appellee paid most of the bills. She admitted Appellee has tried to steer her to right decisions.

{¶26} Madison testified she lived with her boyfriend who was over the age of 18 when she was a junior in high school. Her mother did not know where she was living because she was free to do as she wanted and she "just didn't come home." Madison testified her mother didn't know she was living with the boyfriend but "just knew that I wasn't living with her."

{¶27} At the conclusion of the full hearing, the trial court ordered both parents to complete a hair follicle test. On November 10, 2019, Appellant and Tackett wrote a joint letter to the trial court indicating they were willing to comply with the trial court's request for a hair follicle test but were unable to spare the money for the procedure. Appellant explained any funds they had were spent on

the children's seasonal clothing and gifts.  Appellant suggested the court or Appellee cover the costs of the test.

{¶28} On November 25, 2019, Appellant and Tackett wrote another letter to the trial court.  Appellant and Tackett characterized their home as filled with love and based on household routines such as having snacks, doing homework, clearing the dinner table, watching shows or plays, and then having bath time.  Appellant and Tackett, while acknowledging that most of the years of the child's life they had lived with Appellee, and also acknowledging that the child was happy and well-adjusted, suggested that Appellee's petition was filed for the purpose of "using [the child] as a weapon," and trying to "break up" the family.  Appellant acknowledged that she had made mistakes in her life but stated that she had learned from her mistakes and would never put her children in harm's way.

{¶29} On January 3, 2020, Appellee's counsel filed a closing argument.  On April 8, 2020, the trial court filed the appealed-from judgment entry.  Pertinent to this appeal, the entry states as follows:

> The Court does not believe the Mother is fit and suitable.  The Court finds by a preponderance of the evidence that she contractually relinquished custody of this Child when she allowed the Petitioner to provide for and support her for her entire life and to move away with her for the prior year. * * * The Court further finds that an award of custody to her, the Mother, would be detrimental to the Child.  She is unstable, provides no support, has no home, has no means, uses very poor judgment and sets a bad example, among many other shortcomings.

{¶30} This timely appeal followed.

ASSIGNMENT OF ERROR

I.   THE TRIAL COURT DETERMINATION THAT
THE BIOLOGICAL MOTHER WAS UNSUITABLE
WAS AGAINST THE MANIFEST WEIGHT AND
SUFFICIENCY OF THE EVIDENCE.

A. STANDARD OF REVIEW

{¶31} A trial court has broad discretion in determining custody matters.  *See*

*Purvis v. Hazelbaker,* 181 Ohio App.3d 167, 2009-Ohio-765, 908 N.E.2d 489, ¶ 9

(4th Dist.), citing *Reynolds v. Goll,* 75 Ohio St.3d 121, 124, 661 N.E.2d 1008

(1996).  Consequently, we can sustain a challenge to a trial court's custody decision

only upon a finding that the trial court abused its discretion.  *See Davis v.*

*Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).  When applying an

abuse-of-discretion standard, we are not free to merely substitute our judgment for

that of the trial court.  *See In re Jane Doe 1*, 57 Ohio St.3d 135, 137-138, 566

N.E.2d 1181 (1991).

{¶32} However, in this appeal, Appellant has challenged the trial court's

finding that she contractually relinquished custody of H.R.P.T. to Appellee.  The

Supreme Court of Ohio " ' "has consistently held that the determination of whether

'a parent relinquishes rights to custody' is a question of fact which, once

determined, will be upheld on appeal if there is some reliable, credible evidence to

support the finding." ' " *In re JRA,* 4th Dist. Washington No. 13CA18, 2014-Ohio-4463, at ¶ 18, quoting *In re Mullen,* 129 Ohio St. 3d 417, 2011-Ohio-3361, 953 N.E.2d 302 at ¶ 15, quoting *Masitto v. Masitto,* 22 Ohio St.3d 63, 66, 488 N.E.2d 857 (1986).  We review whether a custody determination is against the manifest weight of the evidence by weighing the evidence and all reasonable inferences, considering the credibility of witnesses, and determining whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.  *See In the Matter of B.E.,* 4th Dist. Highland No. 13CA26, 2014-Ohio-3178, ¶ 28, citing *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.

## LEGAL ANALYSIS

{¶33} " ' "The right of a parent to the custody of his or her child is one of the oldest fundamental liberty interests recognized by American courts." ' " *In the Matter of E.S.,* 4th Dist. Pickaway No. 17CA16, 2018-Ohio-1902, at ¶ 25, quoting *State ex rel. Otten v. Henderson,* 129 Ohio St.3d 453, 2011-Ohio-4082, 953 N.E.2d 809, ¶ 31, quoting *In re Thompkins,* 115 Ohio St.3d 409, 2007-Ohio-5238, 875 N.E.2d 582, ¶ 10.  Consequently, "[p]arents have a constitutionally protected due process right to make decisions concerning the care, custody, and control of their children, and the parents' right to custody of their children is paramount to any

custodial interest in the children asserted by nonparents." *In re Mullen, supra,* 953 N.E.2d 302, ¶ 11. Nevertheless, a parent's paramount right to custody of his or her children is not unlimited. *Id.* Instead, " 'the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.,* 300 So.2d 54, 58 (Fla.App.1974); accord *In re B.C.,* 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 20.

{¶34} Furthermore, if a parent is unsuitable, the parent forfeits his or her paramount right to custody. *E.S., supra* at ¶ 26, citing *In re Perales,* 52 Ohio St.2d 89, 98-99, 369 N.E.2d 1047 (1977). "In a child custody proceeding between a parent and a nonparent, a court may not award custody to the nonparent without first determining that the parent is unsuitable to raise the child, i.e., without determining by a preponderance of the evidence that the parent abandoned the child, contractually relinquished custody of the child, or has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child." *Hazelbaker, supra* at ¶ 10, citing *Perales*, 369 N.E.2d 1047, at syllabus. "The general rule in Ohio regarding original custody awards in disputes between a parent and a nonparent is that 'parents who are "suitable" persons have a "paramount" right to the custody of

their minor children unless they forfeit that right by contract, abandonment, or by becoming totally unable to care for and support those children.' " *Masitto, supra,* 488 N.E.2d 857 (1986), quoting *Perales* at 97, 369 N.E.2d 1047.

{¶35} Appellant asserts that the trial court's determination was against the manifest weight and sufficiency of the evidence. Appellant argues that testimony in the trial court record evidences that she is a mother who is over a decade clean, and who has raised other children who appeared to be well-adjusted. Appellant further argues that the trial court disregarded all the positive evidence presented on her behalf and focused on her marijuana and methadone use to justify a finding of unsuitability. Appellant concludes that there is scant evidence, if any, to support a finding that she contractually relinquished H.R.P.T., or that an award of custody would be detrimental to the child.

{¶36} The Third District considered the issue of contractual relinquishment when it affirmed the judgment of the trial court in *In re Galan,* 3d Dist. Seneca No. 13-02-44, 2003-Ohio-1298. The appellate court found that the evidence presented to the trial court supported findings that the mother had contractually relinquished custody of her daughter and that awarding custody to the mother would be detrimental to the child. In *Galan,* "contractual relinquishment" did not involve a written agreement or prior custody findings, but instead was evinced in the mother's pattern of acquiescence to others since the child's birth, primarily the

paternal grandparents, with regard to the physical custody, care and support of her minor child.

{¶37} In *Galan,* the minor child's parents were never married. From the time of the child's (Delee) birth until the age of four, she lived with her parents at the Galans' (the paternal grandparents') home in Fostoria, Ohio. During that time, the paternal grandmother Mrs. Galan was the primary caretaker.

{¶38} At age four, Delee's mother, Sandra, and Delee left the Galans' home to live with the maternal grandparents in Leipsic, Ohio. There Delee was also left in the maternal grandmother's primary care. One year later, Sandra and Delee moved into a one-bedroom apartment but shortly thereafter returned to the maternal grandparents' home. Delee attended kindergarten and part of her first-grade year in Leipsic.

{¶39} Sometime thereafter, Sandra met a convicted drug felon and moved with him to Toledo, Ohio to live in his mother's house. In December 1999, Sandra placed Delee with the Galan grandparents in Fostoria. In 2001, Sandra returned to Leipsic, obtained employment, and planned to keep Delee with her. The Galans subsequently initiated a complaint for custody, alleging that the mother had voluntarily relinquished custody of the child in December 1999; that the child's contact with her mother had been sporadic; and that it would be in Delee's best interest to remain in the Galans' custody.

{¶40} At a two-day hearing, the magistrate found by clear and convincing evidence that both parents of the child were not suitable custodians and had forfeited their parental rights. Sandra raised timely objections. The trial court rescheduled the matter for hearing and subsequently found Sandra to be unfit.

{¶41} On appeal, mother asserted that the court's findings, pursuant to *In re Perales, supra,* were unsupported by the evidence. In affirming the trial court's decision, the Third District Court noted:

> There is competent, credible evidence to support the assertion that Sandra contractually relinquished custody of Delee and that if Sandra were to regain custody of Delee it would be detrimental to the child. With respect to contractual relinquishment of custody, the record reflects that Delee was voluntarily placed with the Galans by her mother on December 3, 1999, when [Mr.Galan] picked Delee up from school in Leipsic by agreement. That evening Sandra and [Mrs. Galan] had a telephone conversation wherein Sandra placed Delee in the Galans' custody for an indefinite period of time. Both parties confirm the existence of the agreement.

*Id.* at ¶ 19.

{¶42} The appellate court further observed:

> Other testimony supports the trial court's additional finding that Delee's placement with Sandra would also be detrimental to the child. Multiple witnesses testified that during the first four years of Delee's life when Sandra and her child lived in the Galans' home, [Mrs. Galan] was the child's primary caretaker. When Sandra and Delee moved in with Sandra's parents, it was Sandra's mother who was Delee's primary caretaker. The record reflects that the *only time* Sandra was primarily responsible for Delee was the brief period when Sandra rented

[the apartment] in Leipsic, before she and the child returned to Sandra's parents' home. (Emphasis added.)

*Id.* at ¶ 20.

{¶43} Finally, the *Galan* court observed:

[T]he evidence that Sandra consistently placed her own needs above those of her daughter was also properly considered by the trial court as indicia of unsuitability. After meeting her boyfriend Danny, Sandra moved to Toledo to be with Danny uprooting Delee once again. At this time, Delee was a student in first grade and was just weeks away from completing the second quarter of the school year. Because of her mother's move and the child's placement in the custody of her paternal grandparents, Delee was never able to complete the second quarter at St. Wendolyn Elementary. ***[W]itnesses at St. Wendolyn's testified that Sandra never attended a parent-teacher conference and that two years passed before the school had Sandra's address. Witnesses also testified that Sandra's visitation, up until the filing of the Galans' complaint for custody was sporadic.

*Id.* at ¶ 21.

{¶44} Upon review of the law in *Perales,* the *Galan* court concluded the trial court's decision that Sandra contractually relinquished custody of her daughter to the Galans in December 1999 was supported by competent, credible evidence. The court also concluded the trial court's additional finding that an award of custody to Sandra would be detrimental to Delee was supported by the evidence. The court found no abuse of discretion in the trial court's finding that Sandra was an unsuitable parent.

{¶45} We have fully reviewed the record which includes the transcript of the full hearing on November 5, 2019. The trial court set forth a detailed analysis of the evidence presented at the full hearing. Upon review of the testimony, we agree there is competent, credible evidence to support the trial court's factual finding that Appellant contractually relinquished custody of H.R.P.T. to Appellee.

{¶46} In the trial court's discussion of the testimony provided by Appellant, Appellee, Tackett, and Appellant's adult daughter, the trial court observed:

> The Mother does not provide for her children. She allowed Petitioner to pay her rent and bills most of the child's life. * * * She allowed the Petitioner to keep, and care for, this child for the school year immediately preceding the Petition. She did not pay child support and did not contribute to her care. She refused to assist in transporting the child to and from school. She made excuses of why she was unable to help. The transportation allowed the child to finish out the school year after a relocation. This, the Court finds, was a contractual relinquishment of custody. The Petitioner, who works full time and who was paying the Mother's rent, provided all of the transportation as well. * * * The Court finds by a preponderance of the evidence that she contractually relinquished custody of this child when she allowed the Petitioner to provide for and support her for her entire life and to move away with her for the prior year.

{¶47} As is evident, the trial court's summary and finding comports with the testimony given at the full hearing and set forth above. As in *Galan,* the record reflects that the only time Appellant has been primarily responsible for caring for H.R.P.T. is for a very brief period of time, in this case, 60 days. Furthermore, that period occurred only after Appellee's petition was filed and

Appellant decided to remove H.R.P.T. from her elementary school at the end of the first week of the school year. The evidence further demonstrates that Appellant has not financially supported H.R.P.T. her entire life.

{¶48} There is also competent, credible evidence to support the trial court's finding that an award of custody to Appellant would be detrimental to H.R.P.T. In the trial court's discussion, the trial court noted that the mother is "unstable, provides no support, has no home, has no means, uses very poor judgment and sets a very bad example, among many other shortcomings." Again, these conclusions can be made based upon analysis of the testimony at the full hearing, set forth above. And, as in *Galan,* the record reflects that Appellant has not placed importance upon caring for her child, physically or financially, until after Appellee's petition was filed. The trial court's decision specifically stated:

> The mother is a recovering addict. She was in active addiction from 2011 to 2017. * * * She maintains sobriety by attending a Methadone treatment facility every two weeks. She rides there with a friend. The facility is a long distance from her home. She goes there even though there is one much closer to her home. * * * She could easily ride [to the closer facility] with [her husband] saving both time and money. * * * She does not work, yet is not eligible for disability. * * * She caused this child, a premature child, to move out of a home to a camper parked in the drive because she would rather smoke and use drugs.

{¶49} As indicated, Appellant contends the trial court focused upon

her Methadone and marijuana use and disregarded that she had been a decade clean, had raised older children who appeared well-adjusted, and had disregarded other positive evidence in the record. We find this characterization disregards the sum of the evidence presented at the full hearing. While Appellant may have been free of addiction of illegal substances for approximately ten years, the evidence does not demonstrate that during that ten-year period Appellant has managed to complete her education, find and maintain employment, or participate in active parenting.

{¶50} While Appellant has apparently had two older daughters in her custody, K.T. and Madison, well-adjusted may possibly describe only one—Madison, who testified at the hearing. K.T. did not attend the hearing. K.T. was described as "sweet." Unfortunately, the evidence also demonstrates that K.T. failed third grade; that she isolates herself; and that Appellant does not have a routine with K.T. but allows her to stay up late at night playing games. We find it doubtful that this evidence suggests a well-adjusted child.

{¶51} And, while the transcript reflects Madison to be an intelligent and articulate 20-year-old woman, we note that Madison has not completed her education although it appears she was once enrolled at Kent State. She is currently unemployed and not furthering her education. While still a minor, Madison lived with her boyfriend who was over age 18 for two months and Appellant apparently

did not trouble herself to find out where her daughter was.  Importantly, Madison testified that while her mother was addicted for several years, Madison resided with her father.  The admirable but limited success Madison has made thus far in her life may not be fully or fairly attributed to Appellant.

{¶52} Appellant also claims the trial court disregarded other positive evidence in the record.  However, Appellant fails to direct us to this evidence and we are unable to surmise what that evidence may be.

{¶53} In conclusion, we find the aforementioned testimony provided at the full hearing provides a credible basis for the trial court's findings.  The trial court's decision that Appellant contractually relinquished custody of H.R.P.T. to Appellee by failing to provide financial support for the child her entire life and allowing Appellee to move away from her for the entire year preceding the petition is supported by competent credible evidence.  The trial court's additional finding that an award of custody to Appellant would be detrimental to H.R.P.T. is also supported by the evidence.  These findings cannot be found to be against the manifest weight of the evidence.[3]  For the foregoing reasons, we cannot say that the trial court's decision granting custody to Appellee was against the manifest weight and sufficiency of the evidence.

---

[3] " '[T]hough sufficiency and manifest weight are different legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment..' " *In re L.B.,* 10th Dist. Franklin Nos.19AP-644, 19AP-645, 2020-Ohio-3045, at ¶ 29, quoting *In re C.N.,* 10th Dist. No. 15AP-67, 2015-Ohio-2546, ¶ 9.

**JUDGMENT AFFIRMED**.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Wilkin, J. concur in Judgment and Opinion.

> For the Court,
>
> _____
> Jason P. Smith
> Presiding Judge

### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**